



**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

DISTRICT COURT
**F I L E D**

OCT 1 5 2015

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

| | | |
|---|---|---|
| CARTER BANDY, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **CJ-2015-03821** |
| v. | ) ) | Case No. |
| DRAFTKINGS, INC., and FANDUEL, INC. | ) ) ) | **ATTORNEY'S LIEN CLAIMED** **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

<u>CLASS ACTION PETITION</u>          **LINDA G. MORRISSEY**

Plaintiff, Carter Brandy, on behalf of himself and a class of similarly situated individuals, by counsel, for his Petition against Defendants DraftKings, Inc. ("DraftKings"), and FanDuel, Inc. ("FanDuel") (hereinafter collectively referred to as "Defendants"), states as follows:

<u>INTRODUCTION</u>

1.     This is a class action petition, pursuant to OKLA. STAT. ANN. tit. 12, § 2023, against DraftKings and FanDuel, two companies operating daily fantasy sports ("DFS") websites in a manner that violates Oklahoma law.

2.     DFS is a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis. Defendants operate tournaments where individuals accumulate points based on the statistics of players in real professional sporting events occurring on a particular day. Individuals can play for free or pay money to compete for cash prizes.



EXHIBIT
1

1

3.      Defendants make money on the fee they take from each entry into their contests. While the prize pools of these contests are funded from entry fees, Defendants often guarantee prize pools, and will pay out the difference between the guarantee and the entry fees.

4.      The difference between the entry fees in the prize pool and the guarantee is called the "overlay" and gives Defendants additional incentive to attract as many users and entries as possible into contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

5.      DraftKings relies on new users who lack skill to keep its most active users – and therefore profitable entry fee generators – on their site.[1]

6.      Each Defendant engaged in two identical practices that harmed Plaintiff and numerous similarly situated individuals ("the proposed classes").

7.      First, Defendants falsely and misleadingly advertised a bonus promotion to Plaintiff and the proposed classes to induce new players to sign up.

8.      Second, Defendants allowed their employees to use material, non-public, valuable data and information to gain an enormous edge over competitors on their co-Defendant's website and, in turn, knowingly allowed their co-Defendant's employees to compete against their own players, including Plaintiff and the proposed classes, using material, non-public, valuable data and information.

9.      These material misrepresentations and omissions fraudulently induced Plaintiff and the proposed classes to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

---

[1] *Id.*; *see also* https://rotogrinders.com/threads/dk-frequent-player-points-130623;
https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5;
(accessed Oct. 7, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins)

10.     Specifically, Plaintiff deposited and risked $300.00 on DraftKings' tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed classes.

## PARTIES, JURISDICTION AND VENUE

11.     Plaintiff, Carter Bandy, is a resident of Tulsa County, Oklahoma, and a citizen of Oklahoma.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as described in the classes below.

12.     Defendant DraftKings, Inc., is incorporated in Delaware with its principal place of business in Boston, Massachusetts.

13.     Defendant FanDuel, Inc., is a Delaware corporation with its principal place of business in New York, New York.

14.     This Court has subject matter jurisdiction over both the parties and the subject matter because a substantial number of the events giving rise to this Petition occurred in Tulsa County. Additionally, Tulsa County is the proper venue for this action because the events giving rise to the Petition and the damages suffered occurred in Tulsa County.

## FACTUAL BACKGROUND

### A.  Daily Fantasy Sports

15.     Defendants market DFS as a game of skill, similar to chess or the stock market.  It is also similar to pari-mutuel horse race wagering in that players compete against each other for prize pools and Defendants take their fee from the prize pool itself.

16.     Defendants held themselves out to Plaintiff and the proposed classes as places where their skill made a difference between winning and losing.  DraftKings advertised "every

3

week, use your knowledge and showcase your skills....you like football, you like winning."[2]
Again in August 2015, DraftKings advertised its website as "a game within the game, that
requires a different set of skills...we don't just play, we are players, we train, and we win."[3]

17.     Similarly, FanDuel advertised that players could "get paid for [their] knowledge"
if they were "smarter than the average fan."[4]

18.     In reality, a majority of the funds distributed on DFS sites goes to a minority of
individuals at the top.  An analysis of publicly available data by Sports Business Daily found that
in the first half of the 2015 Major League Baseball season, 91% of profits were won by just 1.3%
of players.[5]  An analysis done by Bloomberg showed a similar distribution heavily weighted
towards the top 1% of players.[6]

**B.  Bonus Promotion**

19.     In its television commercials,  FanDuel offered a deposit bonus of up to $200
(with no disclaimer or other details about what restrictions or requirements applied, and with
only a reference to a separate webpage in small type) with the conspicuous text: "We'll Match
Your First Deposit!" and a voice over that describes "up to $200 bonus," all of which represent
to a reasonable viewer that if they deposit $200, FanDuel will match that $200 in bonus money
that the player can use on the site.

20.     DraftKings also advertises the same bonus promotion in television, radio, internet
sites, and their own website – "deposit now and we'll double your cash" (www.draftkings.com,
accessed Oct. 7, 2015).

---

[2] Available at https://www.youtube.com/watch?v=VDa-cDu8KYg
[3] Available at https://www.youtube.com/watch?v=bfCm6PJuL5I
[4] Available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge
[5] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx
(accessed Oct. 7, 2015).
[6] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-
fantasy-football (accessed Oct. 7, 2015)

21.     When potential customers go to DraftKings.com, they encounter a banner headline proclaiming, "Receive a 100% First-Time Deposit Bonus." Directly below, the user is directed to a heading entitled "CLAIM FREE OFFER".

22.     Upon clicking on the "CLAIM FREE OFFER" heading, customers are routed to a page designed to register new users. After choosing a username and password and providing demographic information, the customer is directed to click on a heading entitled "Register."

23.     Upon clicking on the "Register" heading, the site directs customers to the "Deposit" page. Customers are immediately put on notice that they must deposit their cash quickly, lest they lose the 100-percent match. DraftKings then places a large countdown clock as a time limit for the player to make their initial deposit.  Customers are allowed to choose from the following deposit amounts and receive the corresponding bonuses: "[1] $25: $25 Free Bonus; [2] $100: $100 Free Bonus; [3] $250: $250 Free Bonus; [4] $600: $600 Free Bonus." After making a selection and entering payment information, the customer is directed to a deposit confirmation page.

24.     Upon receiving deposit confirmation, customers learn that the ubiquitously advertised, 100-percent deposit match is nothing more than a thinly veiled ruse. Despite promises throughout all of their promotions, a customer's $100 does not become $200 upon deposit.

25.     Indeed, customers receive no money upon depositing. They discover, instead, that they must incur an additional and substantial monetary obligation in order to "double" their deposit.

26.     Specifically, customers must enter fantasy contests and receive bonuses in incredibly small increments. Rather than the guaranteed, instant, 100 percent deposit match, customers receive as a bonus a mere 4 percent of every dollar they put into play.

27.     Plaintiff made his first deposit on DraftKings in December, 2014 because of this deposit match and attempted to claim his bonus.  At no point in any advertisement, through the sign-up process or even the supposed details on the website, does DraftKings explain this in sufficient detail that Plaintiff or any reasonable consumer would believe the offer was anything other than exactly how Defendants advertised: make a deposit and that amount would be doubled.  A customer who deposited $600 would have to wager $15,000 to receive the promised bonus.

28.     On FanDuel, the bonus promotion requires a customer to wager $1,875 in contests to receive the full deposit bonus they advertise.

29.     DraftKings's CEO had personal knowledge that this bonus advertisement was misleading, yet defended it.  In a thread on rotogrinders.com, users complained that the bonus was "semi-useless" and "misleading" because of how difficult it was to clear.  Robins personally responded that "(o)ne point I'd like to add…If you play through half of your bonus, is it any worse than the 50% bonus offered by the next closest site? People seem to be forgetting that it is a 100% bonus."[7]

30.     The large-type representations of the offer of a "Free Bonus," "Free Offer," "100% First-Time Deposit Bonus" and "DOUBLE YOUR CASH" bonus do not contain simple and consistent statements or representations of all the essential points of the offer, and the overall

---

[7] https://rotogrinders.com/threads/has-anyone-else-had-issues-with-how-draftkings-doles-the-82155?page=1#reply-82229 (last visited Oct. 7, 2015).

6

impression of the "bonus" offer is contradicted by the small-print disclaimers in the footnote and on the "FAQ" page.

31.    The representations in the footnote and on the "FAQ" page are by their size, placement, and other characteristics unlikely to be noticed and difficult to understand even though they are material to the offer.

32.    Plaintiff and members of the proposed classes relied on these false, material representations and omissions in choosing to deposit money on DraftKings and FanDuel, and Defendants each made their advertising statements with the intent to deceive Plaintiff and the members of the classes.

## C. Value of Inside Information and Data

33.    DFS customers play against each other by choosing a line-up of players at certain positions until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300. The players whose fantasy teams score the most points – based on the real statistics of those players in that game – win the most money.

34.    DFS is not gambling because of the skill involved in picking a winning team. According to Robins, DraftKings attracts players "who are analytical and favor data and research." Robins said: "They do their homework. It's like the stock market. They enjoy looking at something and trying to figure out something that someone else doesn't see."[8]

35.    The biggest edge any player can have is data and information. DraftKings and FanDuel employees have access to both things, all of which is not public. For instance, DraftKings performs analytics to determine winning strategies, return on investment of certain

---

[8] Howard Stutz, *DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing*, Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (last visited Oct. 7, 2015)

strategies and even how lineups on FanDuel would do if they were entered into DraftKings contests. DraftKings knows the value of this data and knows that it should not be shared.[9]

36.  In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

37.  Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

38.  Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to pick players different from competitors.

39.  Indeed, a DraftKings employee who accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all of the contestants' lineups were "locked" and could still be changed.  This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[10]

40.  However, the same week that he posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[11]  An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

---

[9] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed Oct. 7, 2015)
[10] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 7, 2015).
[11] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015).

41.     DraftKings and FanDuel say this employee beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."[12]

42.     In all, DraftKings employees have won at least $6,000,000 playing at FanDuel.[13] The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using non-public information, data and insider strategic information.

43.     DraftKings was well aware of its employees playing at FanDuel, and aware that some of its employees made more money from winnings on FanDuel than their salaries.[14]

44.     FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website.[15]

45.     Draftkings "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to its competitors about ending the practice, but ultimately decided, in concert with his competitors, to not end the practice.[16]

46.     In that same article, Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

---

[12] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)
[13] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 7, 2015)
[14] https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (Oct. 7, 2015)
[15] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct. 7, 2015)
[16] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)

47.     Robins had previously discussed[17] any sort of issue that affected "game integrity" as fraud.

48.     Robins discussed how sophisticated its data analysis and fraud prevention efforts were, including tracking users by their Internet Protocol, or IP, addresses.  Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

49.     Had Plaintiff and/or members of the proposed classes known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiff and members of the proposed classes would not have played on Defendants' websites.

50.     Had Plaintiff and/or members of the proposed classes known that Defendants had acted in concert to sanction this practice, Plaintiff and members of the proposed classes would not have played on Defendants' websites.

51.     After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

52.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

53.     Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites.

---

[17] https://rotogrinders.com/threads/ok-industry-wide-concern-this-is-not-directed-at-any-single-85017?page=1 (accessed Oct. 7, 2015).

**D. Invalidity of Arbitration Agreement and Contract**

54.    DraftKings's Terms of Use is not a valid, enforceable contract.

55.    Plaintiff and the class were fraudulently induced into placing money onto DraftKings because it was supposed to be a fair game of skill without the potential for insiders to use non-public information to compete against them.

56.    The so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by DraftKings are illusory. Indeed, there is no restriction on DraftKings' ability to terminate the "agreement" or to refuse to perform. For example, the so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever": By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed].

57.    Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendant the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation.

58.    Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your

11

rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.

59.     The Terms of Use purport to require arbitration, but gives DraftKings the exclusive right to revoke the arbitration provision because it states that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

60.     In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions.

61.     Additionally, new customers are required to make their initial deposit in such a short window of time, ten minutes, that there is not enough time for a new customer to research and make an informed decision and to be bound by the Terms of Use.

62.     The Terms of Use are procedurally and substantively unconscionable.

63.     As a direct and proximate result of the actions described above, Plaintiff and members of the proposed classes have been damaged.

**CLASS ALLEGATIONS**

64.     Plaintiff brings this class action pursuant to OKLA. STAT. ANN. tit. 12, § 2023 on behalf of himself and the following class of similarly situated persons:

> All Oklahoma citizens at the time of the filing of this action who, within the applicable statute of limitations preceding the filing of this action to the present, maintained an active player account with DraftKings' and was guaranteed a matching deposit bonus.
> Excluded from the Class are Bank of DraftKings' current and former directors, officers, employees, agents and representatives, and members of their immediate families.

12

65.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

66.     Numerosity. The proposed Class is sufficiently numerous such that joinder is impractical. Upon information and belief, the Class consists of at least thousands of members which can be ascertained through DraftKings' records.

67.     Common Questions of Fact and Law. Common questions of fact and law exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Pursuant to OKLA. STAT. ANN. tit. 12, § 2023 (b), questions of fact and law, which, among others not listed, predominate over any individual issues are whether DraftKings:

    a) Creates a new player account with a guaranteed matching deposit bonus;

    b) Whether Defendants' advertisements were false, misleading or unfair;

    c) Requires new players to agree to the terms and conditions on their website in order to obtain the matching deposit bonus;

    d) Whether Defendants owed duties to Plaintiffs and the proposed classes, the scope of those duties and if they breached those duties;

    e) Whether Defendants fraudulently induced Plaintiff and the proposed classes into using their website under false pretenses, through material misrepresentations or material omissions;

    f) Whether consumers were harmed by Defendants' actions as described above;

    g) Whether the Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

    h) The extent of the damages caused by Defendants' acts;

13

i) Whether Defendants were unjustly enriched through its matching deposit bonus policies and practices;

j) Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiff and the proposed classes that these practices were occurring;

k) Whether Defendant's actions violates the Oklahoma Consumer Protection Act, OKLA STAT. ANN. tit.15 §751 *et. seq.*,  through its policies and practices; and

l) Otherwise commits wrongdoing through its distribution of matching deposit bonus policies and practices.

68.    <u>Typicality.</u> Plaintiff's claims are typical of the claims of members of the Class because Plaintiff and the Class sustained damages arising out of Defendants' wrongful conduct as detailed herein.   The claims of the Class Representative Plaintiff are furthermore typical of other Class members because they make the same claims as other class members. Plaintiff has an interest in seeking compensation from Defendants

69.    <u>Adequacy.</u> Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action lawsuits. Plaintiff has no interests antagonistic to or in conflict with those of Class members and therefore is an adequate representative for the Class members.

70.    <u>Superiority.</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the joinder of all Class members is

impracticable.  Because the amount of each individual putative Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no putative Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the putative Class members will continue to suffer losses and the misconduct of Defendants will proceed without remedy.

71.    Even if putative Class members themselves could afford such individual litigation, the court system could not.  The complex legal and factual issues likely to arise in this case, handled on an individual basis, would significantly increase the delay and expense to all parties and to the Court.  The adjudication of this controversy through a class action will also avoid the possibility of an inconsistent and potentially conflicting adjudication of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

72.    The proposed Classes and/or subclasses are described as follows:

"All persons in Oklahoma who deposited money into a DraftKings account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."

"All persons in Oklahoma who deposited money into a DraftKings account after receiving the representation of a "Free Bonus", "FREE OFFER", "100% First-Time Deposit Bonus," "Double Your Cash" Bonus and/or the like and did not receive 100% of the initial deposit as promised."

73.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

74.    Plaintiff will fairly and adequately protect the interests of the class. The interests of the class representative are consistent with those of the other members of the classes. In

addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

75.   Excluded from the Class are:
   a.   Defendants and any entities in which Defendants have a controlling interest;
   b.   Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;
   c.   The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;
   d.   All persons or entities that properly execute and timely file a request for exclusion from the Class;
   e.   Any attorneys representing the Plaintiffs or the Class.

## COUNT I – NEGLIGENCE

76.   Plaintiffs bring this claim on behalf of themselves and the Class.

77.   Defendants owed duties to Plaintiff and the proposed classes as a user and paying customer of its site to use reasonable care to provide true, reliable and safe information and contests.

78.   Defendants breached its duties to Plaintiff and the proposed classes by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiff and the proposed classes.

79.   In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied false information to Plaintiff, the proposed classes.

80.   Plaintiff and the proposed classes justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

81.   Defendants failed to use reasonable care in communicating the information about

16

bonus promotion programs, safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiff and the proposed classes on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiff and the proposed classes competed.

82.     As a direct and proximate result of Defendants' negligence, Plaintiff and the proposed classes were damaged in the aggregate in an amount to be proven at trial.

## COUNT II – FRAUD AND MISREPRESENTATION

83.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

84.     Defendants by and through their actions and/or omissions violated Okla. Stat. tit. 15 § 58.

85.     Defendants made material representations that were false, that Defendants knew were false or were reckless as to the veracity and made with the inducement for Plaintiff and the class to act upon.

86.     Specifically, and as detailed above, Defendants represented that they would match Plaintiff and the proposed classes' deposits 100%.  Defendants also willfully failed to disclose the true bonus structure or how much Plaintiff and the classes would have to play in order to receive the advertised bonus.

87.     Specifically, and as detailed above, Defendants represented that their contests were fair games of skill.  Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiff and the proposed classes' submissions would use this information to compete against Plaintiff and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff and the classes' ability to

use skill to win.

88.     Plaintiff and the proposed classes acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury.

89.     Plaintiff and the proposed classes would not have deposited money in response to the bonus offer if they had known the bonus was not truly 100% matched like Defendants' advertised.

90.     Plaintiff and the proposed classes would not have deposited money or engaged in any activity on Defendants' websites if they had known that they were competing against individuals with insider knowledge, access and use of non-public data.

91.     Defendants were aware that the integrity of the games was a material fact in inducing Plaintiff and the proposed classes to give them money in exchange for services and agreeing to the alleged contract.

92.     As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiff and the proposed classes were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

## COUNT III – DECEIT

93.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

94.     Defendants by and through their actions and/or omissions violated Okla. Stat. tit. 76 § 2.

95.     Defendants made material representations that were false, that Defendants knew were false or were reckless as to the veracity and made with the inducement for Plaintiff and the class to act upon.

18

96.     Specifically, and as detailed above, Defendants represented that they would match Plaintiff and the proposed classes' deposits 100% which Defendants knew or had reason to know was not true and Defendants did not believe it to be true.

97.     Defendants asserted as a fact that Plaintiff and the proposed class members would receive a 100 percent matching bonus on their original deposit when Defendants had no reasonable ground to believe that was true.

98.     Defendants suppressed the details/facts of the matching bonus payout to Plaintiff and the proposed class and had an obligation to disclose the details/facts.

99.     Defendants gave information to Plaintiff and the proposed class which was likely to mislead for want of communication of that fact.

100.     Defendants made a promise to Plaintiff and the proposed class, without any intention of performing.

## COUNT IV - BREACH OF CONTRACT, INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

101.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

102.     A covenant of good faith and fair dealing is implied in all contracts in Oklahoma, including Plaintiff's and proposed class members' User Agreements with Defendants.

103.     The User Agreement entered into between Plaintiff, the proposed class, and Defendants, constituted a contract and/or was incorporated into Defendants' contract with Plaintiff and the proposed class.

104.     The covenant of good faith and fair dealing prevents one party to a contract from exercising a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract.

19

When a contract provides a single party with discretion, that discretion is not unlimited; it must not be exercised to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain. Defendants exercise judgment and discretion to choose how and when to disburse their offered "Deposit Bonus."

105.   Because the occurrence, amount, and frequency of distribution of their offered "Deposit Bonus" are set unilaterally by Defendants, it has an obligation to honor those offers of a "Deposit Bonus" in good faith. Defendants breached this obligation by, among other things, intentionally misleading consumers as to how the "Deposit Bonus" will be distributed. Defendants thereby evaded the spirit of its agreements with customers, including Plaintiff and all other members of the proposed class.

106.   Individual contractual clauses in Defendants' User Agreements, themselves vague and misleading, combine to exert a further breach of the covenant of good faith and fair dealing. No lay person could possibly read the User Agreement to permit the release of a "Deposit Bonus" in the manner employed by Defendants, as alleged herein.

107.   Defendants have breached the covenant of good faith and fair dealing in the User Agreement through its policies and practices as alleged herein.

108.   Plaintiff and members of the proposed class have performed all, or substantially all, of the obligations imposed on them under the User Agreement.

109.   Plaintiff and members of the proposed class have sustained damages as a result of Defendants' breaches as alleged herein.

## COUNT V - UNJUST ENRICHMENT

110.   Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

20

111.    Plaintiffs bring this claim on behalf of himself and the proposed class.

112.    Defendants have been, and continue to be, unjustly enriched as a result of its wrongful conduct alleged herein to the detriment of Plaintiff and the Class.  Such conduct includes but is not limited to:

a.  Failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiff and the proposed classes;

b.  Failing to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiff and the proposed classes' submissions would use this information to compete against Plaintiff and the proposed classes and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff and the classes' ability to use skill to win all while representing that their contests were fair games of skill.

c.  Failing to use reasonable care in communicating the information about bonus promotion programs, safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiff and the proposed classes on other websites;

d.  Representing that Defendants would match Plaintiff and the proposed classes' deposits 100%.  Defendants also willfully failed to disclose the true bonus structure or how much Plaintiff and the classes would have to play in order to receive the advertised bonus;

113.    As a direct result of Defendants' wrongful conduct alleged herein, Defendants have been enriched at the expense of Plaintiff and the proposed class in the form of improper

21

fees and revenue received as a result of Defendants wrongful conduct alleged herein.

114.   It would be unjust to allow Defendants to retain the benefit.

115.   There is no justification for Defendants' actions.

116.   Plaintiff and the proposed class are entitled to disgorgement and restitution of all wrongfully-obtained gains received by Defendants as a result of its wrongful conduct alleged herein.

117.   Plaintiff and members of the proposed class have no adequate remedy at law.

## COUNT VI – CIVIL CONSPIRACY

118.   Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

119.   As detailed above, the Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

120.   Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players and concealing and not disclosing this to Plaintiff and the proposed classes, Defendants committed negligence and/or fraud.

121.   This overt act was done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites and otherwise profit because of their unlawful activities.

122.   FanDuel knew that its employees played on DraftKings.

123.   Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

124.   As a direct and proximate result of Defendants' concerted actions, Defendant

FanDuel is also liable to Plaintiff and the members of the proposed classes.

## COUNT VII – VIOLATION OF THE OKLAHOMA DECEPTIVE TRADE PRACTICES ACT, Okla. Stat. tit. 75, § 753

125.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

126.     Plaintiffs bring this claim on behalf of themselves and the proposed class.

127.     Plaintiff and the proposed class are persons within the meaning of the Oklahoma Deceptive Trade Practices Act.

128.     Defendants are persons within the meaning of the Act for all purposes therein and its online DFS systems are a service under the Oklahoma Deceptive Trade Practices Act.

129.     Plaintiff and the proposed class are persons entitled to bring a claim pursuant to Oklahoma Deceptive Trade Practices Act.

130.     Defendants violated and continue to violate the Oklahoma Deceptive Trade Practices Act by engaging in the following unconscionable, false, misleading or deceptive act or practice in connection with the signing of new clients under the guise of a matching deposit bonus, which was false or had the capacity to deceive: Representing that the matching deposit bonus would be available to the client upon signing up for a new account and depositing their initial deposit and allowing employees use proprietary information not available to the Plaintiff and the proposed class giving them a competitive advantage in the Defendants' contests.

131.     By engaging in the foregoing conduct, Defendants took advantage of Plaintiff and proposed class members' lack of knowledge to an unfair degree.

132.     Plaintiff and proposed class members sustained actual damages because they failed to receive their matching deposit bonus upon creation of a new account and essentially

received less than what they were entitled to receive from the service without being required to deposit exorbitant amount of money.

133.    Additionally, Plaintiff and proposed class members sustained actual damages because they lost money in contests where Defendants' employees had a marked advantage because of their access to confidential information not available to Plaintiff and proposed class members.

134.    Plaintiff and proposed class members relied upon Defendant's misrepresentations omissions in determining to purchase and/or pay for the defective product/service.

135.    Had Defendants not engaged in the false, misleading or deceptive conduct described herein, Plaintiff and proposed class members would not have entered into an agreement with Defendants, and would not have incurred out of pocket costs as a result of the defect in Defendants' policies and procedures.

136.    By reason of the unlawful acts engaged in by Defendant, and as a direct and proximate result thereof, Plaintiff and proposed class members have suffered ascertainable loss and damages.

137.    Defendants' false promise of a matching deposit bonus produced from Defendants' unconscionable and deceptive acts and practices in connection therewith was and is reckless, shows spite or ill will or demonstrates a reckless indifference to the interests of consumers.

138.    Additionally, Defendants' failure to restrict access to contests by Defendants' employees with access to confidential information not available to Plaintiff and proposed class

24

members was and is reckless, shows spite or ill will or demonstrates a reckless indifference to the interests of consumers.

139.    Plaintiff and proposed class members demand judgment against Defendants for damages suffered by Plaintiff and proposed class members as a result of Defendants' deceptive trade practices plus attorney fees and costs incurred in bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the putative Class, requests that this Court enter judgment against Defendant and in favor of Plaintiff and award the following relief:

a)   For an order certifying the Class and appointing Plaintiff and his counsel to represent the proposed Class;

b)   For an order awarding Plaintiff and the Class actual and compensatory damages in an amount which may be proven at trial;

c)   For an order awarding Plaintiff and the Class punitive damages as to the appropriate causes of action;

d)   For an order awarding Plaintiff and the Class restitution and/or disgorgement as the Court deems proper;

e)   For an order awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs and appropriate by law, and

f)   For an order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the putative Class, demands a trial by jury on all issues

that may be tried to a jury.

Dated:  October 14, 2015

Respectfully submitted,

John M. Thetford, OBA#12892
Terence P. Brennan, OBA #10036
Levinson, Smith & Huffman, P.C.
1743 East 71st Street
Tulsa, Oklahoma 74136
(918) 492-4433 - telephone
(918) 492-6224 – facsimile

*And*

Timothy M. Bunson, OBA#31004
Matthew J. Sill, OBA #21547
SILL LAW GROUP, PLLC
14005 N. Eastern Avenue
Edmond, OK 73013
Tel:    (405) 509-6300
Fax:    (405) 509-6268
tim@sill-law.com
matt@sill-law.com

**Counsel for Plaintiff and Proposed Class**

26

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

CARTER BANDY, on behalf of himself
and all others similarly situated,

    Plaintiff,

v.

DRAFTKINGS, INC., and
FANDUEL, INC.,

    Defendants.

CJ-2015-03821

ATTORNEY'S LIEN CLAIMED
JURY TRIAL DEMANDED

SUMMONS

To the above-named Defendant,

DRAFTKINGS, INC.
c/o National Registered Agents, Inc.
160 Greentree Dr., Ste. 101
Dover, DE 19904

You have been sued by the above-named Plaintiff and you are directed to file a written answer to the attached Petition in the Court at the above address within twenty (20) days after service of this Summons upon you, exclusive of the day of service. Within the same time, a copy of your Answer must be delivered or mailed to the attorney of the Plaintiff.

Unless you answer the Petition within the time herein stated, judgment will be rendered against you with costs of the action.

Issued this 15 day of October, 2015.

By: _____
    Deputy Court Clerk

    X   Certified Mail
    _____ Sheriff _____ County
    _____ Special Process Server

Appointed to serve, PSL# _____

(Seal)

Attorney for Plaintiff
John M. Thetford, OBA # 12892
Terence P. Brennan, OBA # J0036
LEVINSON, SMITH & HUFFMAN, P.C.
1743 East 71st Street
Tulsa, Oklahoma 74136
918.492.4433

This summons was served on _____, 2015.

_____
(Signature of person serving summons)

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

# NATIONAL REGISTERED AGENTS, INC

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  JASON ROBINS
     DRAFTKINGS LLC
     125 Summer St Ste 510
     Boston, MA 02110-1695

SOP Transmittal #  528020605

800-592-9023 · Telephone

Entity Served:  DRAFTKINGS INC. (Domestic State: DELAWARE) (Served as DRAFTKINGS, INC. and FANDUEL, INC., D/b.
                Name discrepancy noted.)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc or its Affiliate
in the State of DELAWARE on this 19 day of October, 2015. The following is a summary of the document(s) received:

1.  Title of Action:  Curez Bundy, on behalf of himself and all others similarly situated, Pltf. vs. DRAFTKINGS, INC. and
                      FANDUEL, INC., D/b.

2.  Document(s) Served:  Other: Summons, Complaint, Jury Demand

3.  Court of Jurisdiction/Case Number:  District Court of Tulsa County - state of Oklahoma, OK
                                        Case # CJ201503821

4.  Amount Claimed, if any:  N/A

5.  Method of Service:
    ___ Personally served by:            ___ Process Server        ___ Deputy Sheriff        ___ U S Marshall
    _X_ Delivered Via:                   _X_ Certified Mail         ___ Regular Mail          ___ Facsimile
    ___ Other (Explain):

6.  Date of Receipt:  10/19/2015

7.  Appearance/Answer Date:  Within 20 days after service, exclusive of the day of service

8.  Received From:  John M. Thetford                              9.  Federal Express Airbill # 781554837109
                    Levinson, Smith & Huffman, P.C.
                    1743 East 71st Street
                    Tulsa, OK 74136
                    918-492-4433                                 10. Call Made to: Not required

11.    Special Comments:
SOP Papers with Transmittal, via Fed Ex 2 Day

NATIONAL REGISTERED AGENTS, INC                     Copies To:

Transmitted by  Amy McLaren

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not
be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL



**CERTIFIED MAIL**

91 7199 9991 7035 8495 7707



---

**LEVINSON, SMITH & HUFFMAN, P.C.**
ATTORNEYS AT LAW
1743 E. 71st Street
Tulsa, OK 74136-6108

TO: DRAFTKINGS, INC.
c/o National REgistered AGents, Inc.
160 Greentree Dr., Ste. 101
Dover, DE 19904

---





## OKLAHOMA
### State Courts Network

The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

## IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

| | |
|---|---|
| CARTER BANDY,<br>          Plaintiff,<br><br>          v.<br><br>DRAFTKINGS INC,<br>          Defendant, and<br>FANDUEL INC,<br>          Defendant. | No. CJ-2015-3821<br>(Civil relief more than $10,000: CLASS ACTION)<br><br>Filed: 10/15/2015<br><br><br>Judge: Morrissey, Linda G. |

## PARTIES

BANDY, CARTER, Plaintiff
DRAFTKINGS INC, Defendant
FANDUEL INC, Defendant

## ATTORNEYS

| Attorney | Represented Parties |
|---|---|
| BRENNAN, TERENCE PATRICK (Bar #10036)<br>LEVINSON SMITH & HUFFMAN PC<br>1743 E 71ST STREET<br>TULSA, OK 74136 | BANDY, CARTER |

## EVENTS

None



EXHIBIT
2

## ISSUES

For cases filed before 1/1/2000, ancillary issues may not appear except in the docket.

**Issue # 1.**    Issue: CLASS ACTION (CLASS)
Filed By: BANDY, CARTER
Filed Date: 10/15/2015

| Party Name | Disposition Information |
|---|---|

**Defendant:**
DRAFTKINGS INC

**Defendant:**
FANDUEL INC

# DOCKET

| Date | Code | Description | Count | Party | Amount |
|---|---|---|---|---|---|
| 10-15-2015 | TEXT | CIVIL RELIEF MORE THAN $10,000 INITIAL FILING. | 1 | | |
| 10-15-2015 | CLASS | CLASS ACTION | | | |
| 10-15-2015 | DMFE | DISPUTE MEDIATION FEE | | | $ 2.00 |
| 10-15-2015 | PFE1 | PETITION  Document Available (#1031191607) 📄TIFF 📄PDF | | | $ 163.00 |
| 10-15-2015 | PFE7 | LAW LIBRARY FEE | | | $ 6.00 |
| 10-15-2015 | OCISR | OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND | | | $ 25.00 |
| 10-15-2015 | CCADMIN02 | COURT CLERK ADMINISTRATIVE FEE ON $2 COLLECTIONS | | | $ 0.20 |
| 10-15-2015 | OCJC | OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND | | | $ 2.00 |
| 10-15-2015 | OCASA | OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES | | | $ 5.00 |
| 10-15-2015 | CCADMIN04 | COURT CLERK ADMINISTRATIVE FEE ON COLLECTIONS | | | $ 0.50 |
| 10-15-2015 | LTF | LENGTHY TRIAL FUND | | | $ 10.00 |
| 10-15-2015 | SMF | SUMMONS FEE (CLERKS FEE) 2 | | | $ 10.00 |
| 10-15-2015 | SMIMA | SUMMONS ISSUED - MAILED BY ATTORNEY | | | |
| 10-15-2015 | TEXT | OCIS HAS AUTOMATICALLY ASSIGNED JUDGE MORRISSEY, LINDA G. TO THIS CASE. | | | |

| Date | Code | Description | Count | Party | Amount |
|------|------|-------------|-------|-------|--------|
| 10-15-2015 | ACCOUNT | RECEIPT # 2015-3192886 ON 10/15/2015. PAYOR:LEVINSON SMITH & HUFFMAN PC TOTAL AMOUNT PAID: $223.70. LINE ITEMS: CJ-2015-3821: $173.00 ON AC01 CLERK FEES. CJ-2015-3821: $6.00 ON AC23 LAW LIBRARY FEE. CJ-2015-3821: $0.70 ON AC31 COURT CLERK REVOLVING FUND. CJ-2015-3821: $5.00 ON AC58 OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES. CJ-2015-3821: $2.00 ON AC59 COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND. CJ-2015-3821: $2.00 ON AC64 DISPUTE MEDIATION FEES. CJ-2015-3821: $25.00 ON AC79 OCIS REVOLVING FUND. CJ-2015-3821: $10.00 ON AC81 LENGTHY TRIAL FUND. | | | |

I, Sally Howe Smith, Court Clerk, for Tulsa County, Oklahoma,
hereby certify that the foregoing is a true, correct and full
copy of the instrument herewith set our as appears on record
in the Court Clerk's Office of Tulsa County, Oklahoma, this

OCT 3 0 2015

By _____ Deputy

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA

CARTER BANDY, on behalf of himself )
and all others similarly situated, )
 )
 Plaintiff, )
 )
vs. ) Case No. CJ-2015-03821
 ) Judge Linda G. Morrissey
DRAFTKINGS, INC., and )
FANDUEL, INC., )
 )
 Defendants. )

## NOTICE OF FILING NOTICE OF REMOVAL TO FEDERAL COURT

PLEASE TAKE NOTICE that Defendant DraftKings, Inc., by counsel, has filed a Notice

of Removal of this action, pursuant to 28 U.S.C. §§ 1441, 1446 and 1453, in the United States

District Court for the Northern District of Oklahoma.  Pursuant to 28 U.S.C. § 1446(d), "the

State Court shall proceed no further unless and until the case is remanded."  A copy of the Notice

of Removal is attached and filed as **Exhibit A** herewith.

    **Respectfully submitted,**

    **STEIDLEY & NEAL, P.L.L.C.**

By: _____
    Charles D. Neal, Jr., OBA #6591
    cdn@steidley-neal.com
    Gary C. Crapster, OBA #22452
    gcc@steidley-neal.com
    CityPlex Towers, 53rd Floor
    2448 East 81st Street
    Tulsa, OK 74137
    (918) 513-3521 telephone
    (918) 664-4133 facsimile
    *Counsel for Defendant DraftKings, Inc.*

EXHIBIT
3

## CERTIFICATE OF SERVICE

I hereby certify that on the _____ day of November, 2015, a true and correct copy of the foregoing was sent via U.S. mail with proper postage fully prepaid to:


John M. Thetford
Terence P. Brennan
Levinson, Smith & Huffman, P.C.
1743 East 71st Street
Tulsa, OK 74136

Timothy M. Bunson
Matthew J. Sill
Sill Law Group, PLLC
14005 N. Eastern Ave.
Edmond, OK 73013


_____
Charles D. Neal, Jr.